UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

EXCEPTIONAL URGENT CARE CENTER
I, INC., a Florida corporation,

        Plaintiff,

-vs-                           Case No.  5:08-cv-284-Oc-10GRJ

PROTOMED MEDICAL MANAGEMENT
CORPORATION, a foreign corporation,

        Defendant.
_____/

## **O R D E R**

On May 16, 2008 the Plaintiff filed a Complaint in the Circuit Court of the Fifth

Judicial Circuit In and For Marion County, Florida, alleging claims of breach of warranty and

breach of contract against the Defendant.  The Defendant removed the case to this Court

on July 9, 2008 on the grounds of diversity jurisdiction.  See 28 U.S.C. § 1332.  The case

is presently before the Court for consideration of the Defendant's Motion to Dismiss, Or,

In The Alternative, Motion to Transfer Venue, (Doc. 7), which has been fully briefed by all

sides (Docs. 9, 13).  For the reasons discussed below, the Court concludes that the motion

to dismiss for lack of personal jurisdiction  is due to be denied, and that the motion to

dismiss for improper venue and motion to transfer venue shall be referred to the United

States Magistrate Judge for further proceedings.

## Factual Background

I.   Allegations of the Complaint

Plaintiff Exceptional Urgent Care Center I, Inc. ("Exceptional") is a Florida corporation engaged in providing urgent medical care services with its principal place of business in Summerfield, Florida.   (Doc. 2, ¶ 1).   Defendant ProtoMed Medical Management Corporation ("ProtoMed") is a Maryland corporation with its principal place of business in Linthicum, Maryland.  (Id., ¶ 2).   ProtoMed is in the business of designing, producing, manufacturing, promoting, marketing, distributing, installing and selling computer billing software to physicians throughout the United States.  (Id., ¶ 3).

ProtoMed has designed and produced a computer software program known as the ProtoMed Medical Management Software ("ProtoMed Software"), which is utilized by health care practitioners to manage billing claims submitted to private insurance carriers and Medicare.   (Doc. 2, ¶ 7).   The primary purpose of the software is to ensure that claims submitted by health care practitioners are paid by eliminating untimely filing losses and validating lost claims submissions.  (Id., ¶ 8).

In **October 2006**, Exceptional purchased the ProtoMed Software pursuant to an oral agreement.  (Doc. 2, ¶ 9).   ProtoMed installed the software onto Exceptional's computers, provided the initial setup, and trained Exceptional's employees.  (Id., 10).   Starting in January 2007, Exceptional noticed a significant decline in the payment of claims submitted via the software.   Exceptional alerted ProtoMed of the problem and requested that

ProtoMed investigate and fix it.  ProtoMed determined that it had mistakenly inserted the wrong identification number for Exceptional during the initial installation of the software. (Id., ¶¶ 11-12).  ProtoMed assured Exceptional that the problem was corrected and all future claims would be submitted directly to Medicare and not through a third-party clearinghouse.  Based on these representations, Exceptional continued to use the software.  (Id., ¶ 13).

In November 2007, Exceptional again noticed a substantial decline in the payment of submitted claims, and again demanded that ProtoMed investigate and correct the problem. (Doc. 2, ¶¶ 13-14).  ProtoMed sent technical support personnel to Exceptional's offices in Florida to investigate.  On January 22, 2008, ProtoMed personnel discovered and reported to Exceptional's management that over $1,000,000 in claims had not been processed and were "hanging in cyberspace" somewhere between the ProtoMed claims manager and ProtoMed's third-party clearinghouse.  ProtoMed personnel also confirmed that all Medicare claims were still being submitted through a third-party clearinghouse. (Id., ¶ 15).  ProtoMed refused to explain to Exceptional why this happened, and instead summarily concluded that any problems with the payment of claims were due to Exceptional's employees, not ProtoMed Software.

Exceptional contends that the ProtoMed Software contains a defect because it would routinely forward claims utilizing Exceptional's incorrect billing identification information, resulting in unpaid and lost claims, yet ProtoMed has repeatedly refused to acknowledge or fix the problem with the software. (Doc. 2, ¶¶ 17-18).  As a result, Exceptional instituted

this lawsuit, alleging a claim for breach of warranty (Count I), and breach of contract (Count II).

Exceptional alleges that this Court has *in personam* jurisdiction over ProtoMed because the Company has "sufficient and continuing business in the State of Florida and Marion County, [has] minimum contacts with the State of Florida, and otherwise [has] intentionally avail[ed] itself to the markets within the State of Florida, through the promotion, sale, marketing, and distribution of its products and services in the State of Florida so as to render the exercise of jurisdiction by the courts of the State of Florida permissible under traditional notions of fair play and substantial justice."  (Doc. 2, ¶ 5).  Exceptional further alleges that venue is appropriate in Marion County (within this division of this District) because: (1) all transactions and events giving rise to the claims in this case occurred in Marion County; (2) ProtoMed sold, advertised, promoted, and distributed its software in Marion County; and (3) ProtoMed "engaged and staffed a full-time sales representative in Marion County."  (Id., ¶ 6).

## II.   ProtoMed's Proffered Evidence

In support of its motion to dismiss, ProtoMed has submitted the declaration of Lawrence R. Walsh, Chief Executive Officer of ProtoMed (Doc. 5).  As stated in Walsh's declaration, ProtoMed has its corporate headquarters and principal place of business in Linthicum, Maryland, approximately 10 miles from the city of Baltimore.  (Id., ¶ 3).  All of ProtoMed's officers and senior executives work out of the Linthicum, Maryland headquarters, and all of ProtoMed's accounting services take place at that location.   (Id.,

¶ 6).  According to Walsh, all of the employees who had any involvement with Exceptional during the relevant time periods, and who have knowledge of the facts of this litigation, work at the Linthicum, Maryland offices.  (Id.).

From April 3, 2006 to June 30, 2006, ProtoMed employed Bruce Fox as its national sales manager to develop national sales channels and recruit independent resellers for ProtoMed Software.  (Doc. 5, ¶ 7).  During his employment with ProtoMed, Fox resided in Florida, but worked out of ProtoMed's Linthicum offices.  (Id., ¶ 8).  Fox was trained in Maryland, and all records of his sales activity were electronically maintained on servers located in Maryland.  Fox did not sell any ProtoMed products or services to any Florida resident while he was employed by ProtoMed.  (Id.).

Other than Fox, ProtoMed has never employed a resident of Florida; does not have an office, agency, or subdivision in Florida; does not have a telephone listing or mailing address in Florida, and does not have a Florida bank account.  (Doc. 5, ¶¶ 26-27).  ProtoMed does not own tangible or real property in Florida, and all of its documents relating to its business, including corporation files and records, are located and maintained in Linthicum, Maryland.  (Id., ¶¶ 30, 32).  Walsh further states that ProtoMed does not directly solicit, market, or advertise in Florida, and does not direct its promotions, advertising, or solicitation towards Florida residents.  (Id., ¶ 28).  Since its inception, ProtoMed has only sold its software products to seven (7) Florida residents.  Two sales were made directly by ProtoMed, while the other five were sold through an independent contractor.  (Id., ¶ 29).

On June 30, 2006, ProtoMed and Fox entered into a termination agreement.  (Doc. 5, ¶ 9).  On July 20, 2006, ProtoMed and Fox executed a Value Added Reseller Agreement ("VAR"), through which Fox would sell ProtoMed's products as an independent contractor. (Id.).  Pursuant to the VAR, ProtoMed appointed Fox to act as its agent to: (1) promote and market its products to prospective customers; (2) solicit orders for products and enter into contracts to sell those products; and (3) provide installation and training services to customers who purchase ProtoMed's products.  (Doc. 5, Ex. A, Section 3).  The VAR gave Fox the authority to market, sell, and distribute ProtoMed products in Tampa, Ocala, and Gainesville, and provided Fox with the ability to market in other areas throughout the United States, upon ProtoMed's written approval.  (Id., Ex. A, Attachment C).

Among other things, the VAR obligated Fox to "[a]ctively promote the marketing, licensing, installation, training, and use of" ProtoMed's software and maintenance and support services, as well as to "generally assist [ProtoMed] in the commercial exploitation of the Territory." (Id., Section 5.1)  Fox was prohibited from distributing any of ProtoMed's products through internet or mail order sales, and agreed to provide ProtoMed with monthly sales forecasts for product orders, along with other periodic reports.  (Id., Section 5.2, 5.3). The VAR also dictated both the method by which Fox would deliver ProtoMed's products to customers, as well as requirements for employing sales and technical staff, and provided that ProtoMed would establish all prices and payment schedules.  Fox was also obligated to provide an annual business plan, to attend at least one ProtoMed seminar, and to attend periodic meetings for resellers.  (Id., Sections 5.3-5.14, 6, 7).

Fox sold ProtoMed's and other companies' software products under the name Practice Technologies Group, LLC.  (Doc. 5, ¶ 9, n. 1).  On or about September 13, 2006, after Fox entered into the VAR, Exceptional purchased the ProtoMed Software directly from Fox.[1]  (Id., ¶ 10).  Fox then hired and paid ProtoMed as a subcontractor to install the software on Exceptional's computers and to train Exceptional's billing employee on how to use the software.  (Id., ¶ 11).  Exceptional did not directly pay ProtoMed for its services.

The software Exceptional purchased contained a clickwrap agreement that requires the user to agree to the terms of ProtoMed's End User License Agreement ("EULA") upon installation.[2]  (Doc. 5, ¶ 12).  Section 9 of the EULA contains a forum selection clause which reads:

> **Governing Law, Jurisdiction, Venue:**  This EULA and performance under this EULA shall be governed by the laws of the State of Maryland, exclusive of its choice of law principles, and the laws of the United States of America, as applicable. EXCLUSIVE VENUE FOR ALL DISPUTES ARISING OUT OF OR RELATING TO THE AGREEMENT SHALL BE THE STATE AND FEDERAL COURTS IN BALTIMORE CITY, MARYLAND, AND EACH PARTY IRREVOCABLY CONSENTS TO SUCH PERSONAL JURISDICTION AND WAIVES ALL OBJECTIONS THERETO.

(Id., Ex. B).

---

[1] This date contradicts Exceptional's allegation that it purchased the software in October 2006.  However, it is undisputed that the sale was completed after Fox ceased his employment with ProtoMed.

[2] A clickwrap contract refers to an agreement that requires a computer user to read the agreement and click "I accept" before proceeding to the next screen or obtaining additional information.  Salco Distributors, LLC v. iCode, Inc., No. 8:05 CV 642 T 27TGW; 2006 WL 449156 * 2, n. 5 (M.D. Fla. Feb. 22, 2006).

The EULA further provides that :

> [b]y installing, copying, or otherwise using the PRODUCT, you agree to be bound by the terms of this EULA.  If you do not agree to the terms of this EULA, do not install or use the PRODUCT.  As used in this EULA, the term "you" . . . includes the individual, corporation, or other entity purchasing this EULA, along with any users of the PRODUCT authorized by that person, corporation, or entity.

(Id., p. 1).

On October 10, 2006, Walsh installed the ProtoMed Software onto Exceptional's computer.  (Doc. 5, ¶ 14).  Exceptional began to use the software as soon as the installation and training was completed.  (Id.).  Walsh contends that he installed the software solely in his role as a subcontractor hired by Fox, and that Fox was acting as Exceptional's agent.  (Id.).

On December 1, 2006, and March 31, 2008, ProtoMed furnished two updated versions of its EULA to Exceptional.  (Doc. 5, ¶ 15).  The updated sections were contained in addendums to the EULA; the forum selection and agreement to bound provisions have not changed since Exceptional purchased the software.  (Id.).

In January 2008, Exceptional complained to ProtoMed that the software was "dropping" claims, resulting in unpaid claims that had not been submitted to Medicare for payment.  (Doc. 5, ¶ 17).  ProtoMed conducted an investigation from its Maryland offices, and discovered that Exceptional's problems were due to improper data entry by Exceptional's biller, as well as Exceptional's failure to properly monitor and correct rejected Medicare claims.  (Id., ¶ 18).

8

At Exceptional's request, Walsh traveled to its Florida office on January 22, 2008 to explain the outcome of ProtoMed's investigation, and to offer Exceptional assistance and additional software training.  (Doc. 5, ¶ 19).  Exceptional refused to accept ProtoMed's explanation for the billing problems, and refused the offer of additional training.  (Id.).  To date, Walsh has not received from Exceptional any evidence of "dropped" Medicare claims that cannot be accounted for by ProtoMed as either improperly entered or verifiably rejected.  (Id., ¶ 20).

Exceptional continued to use ProtoMed's software through February 29, 2008, and Walsh believes that Exceptional continued to use the software after that date.  (Id., ¶ 21).  Other than the January 22, 2008 visit, no other ProtoMed employee has visited Exceptional's Florida office, and all of Exceptional's communications with ProtoMed, whether by telephone, on-line, or email, were handled by ProtoMed employees and representatives in Maryland.  (Id., ¶¶ 22-25).

III.   Exceptionals' Proffered Evidence

   A.   **John Im**

In response to ProtoMed's motion, Exceptional has submitted the affidavit of John Im, Exceptional's President and the individual who was most directly involved in the purchase of the ProtoMed Software.  (Doc. 9-2).  At some point in early 2006, Im contacted Fox to discuss a potential purchase of ProtoMed's products.  Fox prepared a needs analysis, made a product presentation to Im, and submitted a sales proposal to Exceptional

- all while Fox was still employed as ProtoMed's national sales director. (Id., ¶ 3). During this time, and at all other times, Im dealt with both Fox and ProtoMed through its office at 5045 Southwest 109 Loop, Ocala, Florida. (Id., ¶ 4). All phone calls were made to Bruce Fox at his Ocala, Florida phone number. (Id.).

According to Im, he received a hard copy of ProtoMed's EULA at some point after he purchased the software, but prior to installation.[3] (Doc. 9-2, ¶ 7). Im contends that he rejected the terms of the EULA and refused to execute a copy of the Agreement prior to installation of the software. (Id.). No one at Exceptional's offices ever downloaded the software, and no one at Exceptional ever agreed to the terms of the EULA or clicked on any agreement. (Id., ¶ 5). Im avers that if he had known that users of the ProtoMed Software must accept the terms of the EULA upon installation, he would have rejected such acceptance as well. (Id.).

Following installation of the software, Im states that Walsh personally traveled to Exceptional's Florida office to conduct final software configuration and initial training, and that Walsh subsequently traveled to Exceptional's offices on numerous occasions to provide ongoing training and technical support. (Doc. 9-2, ¶ 6).

### B.   Bruce Fox

Exceptional has also submitted an affidavit from Bruce Fox, who states that he was hired by Walsh as ProtoMed's national sales director, with responsibilities for the sale and

---

[3]The VAR mandated that Fox provide a copy of the EULA to all customers at the time of the delivery of the ProtoMed Software. (Doc. 5, Ex. A, Section 5.6(a)).

promotion of ProtoMed products in Florida and elsewhere.  (Doc. 9-3, ¶ 2).  At all times,

Fox's office was located at 5045 Southwest 109 Loop, Ocala, Florida.  (Id., ¶ 3).

While employed as national sales director, Fox contends that more than 80% of his

sales efforts on behalf of ProtoMed, including cold calls, product presentations, and general

solicitations, were directed towards potential customers located in Florida.   (Doc. 9-3, ¶

4).  Fox and Walsh attempted to have Fox route his sales and promotion calls through

ProtoMed's Maryland offices, but that proved to be impractical and, ultimately, was not

followed.  Fox avers that he routed all calls directly to his Ocala phone  number, with

Walsh's knowledge and approval.  (Id., ¶ 5).  Fox's marketing and sales efforts resulted in

the sale of ProtoMed's products in Florida, the majority of which were completed after Fox

ceased his employment.[4]  (Id., ¶¶ 6-7).  Fox also states that Walsh made several trips to

Florida in an effort to develop business relationships with Florida companies, and

frequently asked Fox to engage in marketing campaigns targeting Florida medical

practices.  (Id., ¶ 13).

---

[4]Fox states that while he was still an employee of ProtoMed, he sold its software to Dr.
James DeStephens in Gainesville, Florida.  This statement is directly contradicted by ProtoMed
in a supplemental declaration by Lawrence R. Walsh, who has also provided email
correspondence establishing that the sale was completed after Fox entered into the VAR.  (Doc.
13-3, Exs. A & B).  ProtoMed has also submitted in rebuttal the declaration of Tina Johnson,
ProtoMed's former Chief Operating Officer. (Doc. 13-2).  Johnson states that at all times during
Fox's employment as national sales director, he was specifically required to use the Linthicum,
Maryland offices as his sales office; that no one at ProtoMed ever authorized him to use a Florida
sales office or a Florida telephone number; and that Fox was coached and trained repeatedly on
the necessity of using ProtoMed's Maryland headquarter only as his sales office.  (Id., ¶¶ 4-7).
Johnson terminated Fox's employment due to his failure to adhere to ProtoMed's operational
directives and procedures, and failure to produce sufficient sales.  (Id., ¶ 8).

Fox's initial contact with Im took place while Fox was still national sales director for ProtoMed.  While employed by ProtoMed, Fox made a product presentation to Im, prepared a needs analysis, and submitted a sales proposal to Exceptional.  The sale was not completed, however, until after Fox had entered into the VAR.  (Doc. 9-3, ¶ 8).

Fox further states that once he entered into the VAR, he became ProtoMed's agent for the purpose of selling ProtoMed's products in Florida and elsewhere.  He never hired ProtoMed as a subcontractor, but simply sold their products in Florida.  Other than very basic initial training, ProtoMed was required to do all installation, software configuration, and comprehensive training for their software products.  (Id., ¶¶ 9-10).

Fox also confirms that ProtoMed installed the software onto Exceptional's computers via a remote connection, and that no one at Exceptional had the opportunity to review, object to, or authorize agreement to the EULA.  Following installation, Walsh made several trips to Exceptional's offices to train and de-bug the software.  (Id., ¶¶ 11-12).

## Discussion

I.    Motion to Dismiss for Lack of Personal Jurisdiction.

**A.    Standard of Review**

ProtoMed first argues that dismissal is appropriate under Fed. R. Civ. P. 12(b)(2) because Exceptional cannot establish the existence of personal jurisdiction over ProtoMed. A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case

of jurisdiction.  Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1214 (11th Cir. 1999).  See also Cable/Home Communication Corp. v. Network Prods., Inc., 902 F. 2d 829, 855 (11th Cir. 1990) (the plaintiff's burden is to state a "prima facie case of personal jurisdiction over the nonresident defendant").  Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1268 (11th Cir. 2002); Posner, 178 F.3d at 1214.

A federal court exercising diversity jurisdiction undertakes a two-step inquiry in determining whether personal jurisdiction exists:  the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  United Technologies Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009); Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1166 (11th Cir. 2005). See also Venetian Salami Co. v. Parthenais, 554 So.2d 499 (Fla. 1989) (stating the proper test for personal jurisdiction under Florida law).  "The reach of the [Florida long-arm] statute is a question of Florida law. [F]ederal courts are required to construe [such law] as would the Florida Supreme Court. Absent some indication that the Florida Supreme Court would hold otherwise, [federal courts] are bound to adhere to decisions of [Florida's] intermediate courts."  Meier, 288 F.3d at 1272 (internal quotation marks and citations omitted).

**B.    Florida's Long-Arm Statute**

Exceptional first asserts that ProtoMed is subject to jurisdiction under section 48.193(1)(a) of the Florida long-arm statute, which provides:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
> (a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

Fla. Stat. § 48.193(1)(a).[5]

Exceptional alleges in its Complaint that: (1) ProtoMed promoted, sold, marketed, and distributed its products and services in Florida; (2) ProtoMed engaged and staffed a full-time sales representative in Marion County, Florida; (3) Exceptional - a Florida corporation and resident - purchased ProtoMed's Software in Florida pursuant to an oral agreement; (4) ProtoMed's software failed to perform as promised in Florida; and (5) ProtoMed refused to acknowledge or correct the software's defects. See Doc. 2, ¶¶ 1, 5-6, 9, 11-18.  These allegations appear to be sufficient to establish a *prima facie* case for the exercise of personal jurisdiction over ProtoMed.

---

[5]The Parties agree that personal jurisdiction does not exist under § 48.193(2), the long-arm statute's general jurisdiction provision.

However, ProtoMed, largely through its submission of Walsh's declaration and exhibits, has specifically denied each allegation, and asserts that ProtoMed has virtually no contacts in Florida.  With respect to § 48.193(1)(a), ProtoMed argues that it has never operated, conducted, engaged in, or carried on a business or business venture in Florida.  Instead, ProtoMed contends it conducted its business from an out-of-state office as if it was in Florida, which it claims is not sufficient to confer jurisdiction under the statute.

Fox's affidavit, coupled with ProtoMed's own evidence, directly contradict this theory.  "In order to establish that a defendant is 'carrying on business' for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit."  Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1167 (11th Cir. 2005) (quoting Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000).  The record before the Court establishes that at all relevant times, ProtoMed conducted a business venture in Florida for its own pecuniary benefit, and had an office and/or agency in the state.  For several months Fox worked in Florida as ProtoMed's employee; devoting almost all of his efforts towards promoting and selling ProtoMed's products in Florida.  Although ProtoMed contends that it did not authorize Fox to use a Florida business address or telephone number while he was an employee, it is undisputed that Fox did in fact operate out of a Florida location, solicit Florida customers, and market and advertise ProtoMed's products in Florida, and that ProtoMed reaped the benefits of these efforts.

The fact that in July 2006 Fox's relationship with ProtoMed converted into an agency relationship does not shield ProtoMed from personal jurisdiction.  Florida's long-arm statute provides that personal jurisdiction exists when an entity personally, or through an agent, conducts a business venture in Florida, or has an office or agency in the state.  The terms of the VAR expressly state that Fox was appointed ProtoMed's agent for the Gainesville, Ocala, and Tampa sales territories in order to:  (1) promote and market its products to prospective customers; (2) solicit orders for products and enter into contracts to sell those products; and (3) provide installation and training services to customers who purchase ProtoMed's products.  Exceptional has presented the unrefuted testimony of Fox that he performed these duties pursuant to the VAR, and that he continuously maintained an office in Florida, resulting in several sales on behalf of ProtoMed to Florida clients, including Exceptional.  Contrary to ProtoMed's assertions, Fox was not operating as an independent contractor, but was ProtoMed's agent in Florida.  See Keys Jeep Eagle, Inc. v. Chrysler Corp., 897 F. Supp. 1437, 1442-43 (S.D. Fla. 1995) (citing Goldschmidt v. Holman, 571 So. 2d 422, 424 n. 5 (Fla. 1990)) (setting forth elements of an agency relationship in Florida).

Based on the record before the Court, ProtoMed was not operating from an out-of-state office as if in Florida, but was operating directly in Florida - first through its employee, then through its agent.  Personal jurisdiction exists under § 48.193(1)(a).[6]  See Tananta v.

---

[6]Under Florida law, where conflicting affidavits create disputed issues of fact concerning long-arm personal jurisdiction, the appropriate procedure is to hold an evidentiary hearing.  See Venetian Salami, 554 So. 2d at 503; Doe v. Thompson, 620 So. 2d 1004, 1005 (Fla. 1993).  In this
(continued...)

Cruise Ships Catering and Services Int'l., 909 So. 2d 874, 896 (Fla. 3rd DCA 2004) ("It is well-established that a person or corporation who maintains an agent in Florida is deemed to be present here."); Enic, PLC v. F.F. South & Co., Inc., 870 So. 2d 888, 890-91 (Fla. 5th DCA 2004) (noting that if Florida entity can be regarded as non-resident corporation's agent, then personal jurisdiction exists under § 48.193(1)(a)); Canron Corp. v. Holt, 444 So. 2d 529 (Fla. 1st DCA 1984) (holding that defendant was "doing business" under § 48.193(1)(a) where it solicited business in Florida, sent sales persons to visit Florida customers, had a service representative residing in Florida, and conducted training for its product).  See also Polymers, Inc. v. Ultra Flo Filtration Systems, Inc., 33 F. Supp. 2d 1008 (M. D. Fla. 1998) (a corporation may be subject to jurisdiction when it transacts business through its agents in the forum state, unless the agents are transacting business on their own account).[7]

## C.    Due Process Analysis

Because there is personal jurisdiction pursuant to the Florida Long Arm Statute, the Court must next determine "whether sufficient minimum contacts exist between the

---

[6](...continued)
case, however, the disputes created between the affidavits concern issues of fact that are not determinative of personal jurisdiction, (such as whether Fox was authorized to use a Florida business number during his employment with ProtoMed and the timing of DeStephen's purchase of software from Fox), and therefore an evidentiary hearing is not necessary.   Stated differently, whether Fox acted as ProtoMed's employee or agent is a distinction without a difference under the plain language of § 48.193(1)(a).

[7]Because personal jurisdiction exists under § 48.193(1)(a), the Court need not consider Exceptional's alternative argument that personal jurisdiction also exists under § 48.193(1)(g).

defendants and the forum state so as to satisfy 'traditional notions of fair play and substantial justice.' under the Due Process Clause of the Fourteenth Amendment " Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 626 (11th Cir. 1996) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).   Minimum contacts must be "purposeful" contacts in order to "ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum."   Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-74, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

In this circuit, a three-part test is applied in deciding whether the minimum contacts requirement is met: (1) the contacts must be related to the plaintiff's cause of action or have given rise to it; (2) the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws; and (3) the defendant's contacts within the forum state must be such that it should reasonably anticipate being haled into court there.   Posner, 178 F.3d at 1220; Sculptchair, 94 F.3d at 631.   In determining whether the exercise of jurisdiction would offend notions of fair play and substantial justice, the court should consider the burden on the defendant of defending the suit in Florida; Florida's interest in adjudicating the suit; the plaintiff's interest in obtaining effective relief; the interests of the interstate judicial system in using resources efficiently; and the interests of the states in furthering shared substantive policies.   Posner, 178 F.3d at 1221.

The minimum contacts requirement is met in this case.   There is no real dispute that ProtoMed's contacts, both independently and through Fox, gave rise to Exceptional's

claims for breach of contract and breach of warranty.  It is also clear that ProtoMed purposefully availed itself of the privilege of conducting business in Florida such that it should have reasonably anticipated being haled into court here.  ProtoMed hired Bruce Fox, a Florida resident, for the express purpose of soliciting, marketing, advertising, and selling its software products to Florida customers, and Fox spent over 80% of his sales efforts targeting Florida customers.  ProtoMed subsequently entered into an agency relationship with Fox to perform these same functions, and specifically instructed Fox to target the Gainesville, Ocala, and Tampa markets.  ProtoMed reaped the benefit of these actions through sales in Florida, and provided maintenance and repair services to Exceptional in Florida, including at least one visit from ProtoMed's Chief Executive Officer.  These facts, which ProtoMed has not refuted, are sufficient to show that ProtoMed purposefully directed its activities at residents of Florida such that ProtoMed should reasonably have anticipated being haled into court here.[8]  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (where forum state seeks to assert specific jurisdiction over an out-of-state defendant, due process requirements are satisfied if defendant has purposefully directed its activities at residents

---

[8]A defendant has "fair warning" that a particular activity may subject him to the jurisdiction of a foreign state, where, as here, the defendant purposefully directed its activities at the forum state and the litigation resulted from alleged injuries that "arise out of or relate to" those activities. Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 258 (11th Cir. 1996) (internal citations omitted). ProtoMed argues that the forum selection clause in the EULA reinforces that ProtoMed did not anticipate being haled into a Florida court.  On the contrary, the forum selection clause suggests just the opposite - that ProtoMed was well aware that its activities might result in commercial litigation in Florida (or in other states - other than Maryland - in which it did similar business) and it wished to avoid litigating in those fora, a perfectly legitimate contractual objective.

of that forum).  See also Asahi Metal Industries Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (marketing a product through a distributor who has agreed to serve as a sales agent for non-resident defendant may indicate an intent or purpose to serve the market in the forum state); Sculptchair, 94 F.3d at 631 (marketing products in the forum constitutes a purposeful availment).

The Court is further persuaded by the fact that ProtoMed's sales in Florida were not fortuitous, but rather a product of its activities which were purposefully directed towards Florida.  This is not a case where a non-resident corporation received an unsolicited call from a Florida resident, who heard of the non-resident corporation's products by word of mouth or happenstance.  Cf. Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1034 (11th Cir. 1991) (random, attenuated, or fortuitous contact initiated by a Florida plaintiff does not satisfy the minimum contacts requirement under the Due Process Clause).  Nor is this a case where a manufacturer placed a product in the stream of commerce, and the stream eventually swept the product into the forum state.  Cf. Asahi, 480 U.S. at 110.  This is a case where a Maryland corporation intentionally directed its sales and marketing efforts into Florida, with the intention of doing business in this state, and in fact conducted business in Florida.  In such circumstances, ProtoMed should have anticipated it would face litigation in Florida.  See A.J. Sackett & Sons Co. v. Frey, 462 So. 2d 98, 99 (Fla. 2d DCA 1985) (a "manufacturer who sells a piece of machinery in Florida can hardly take the position that he could not reasonably anticipate being haled into a Florida court in a dispute over the quality of that machinery.") (internal citations omitted); see also Advanced

Bodycare Solutions LLC v. Thione International, 514 F. Supp.2d 1326, 1331 (S.D. Fla. 2007).

The Court's exercise of personal jurisdiction over ProtoMed also comports with traditional notions of fair play and substantial justice. While the conduct of this suit in Florida will necessarily involve some inconvenience to ProtoMed as a non-resident litigant, "modern methods of transportation and communication reduce this burden significantly." Posner, 178 F.3d at 1221. See also E-One, Inc. v. R. Cushman & Associates, Inc., No. 5:05-cv-209-Oc-10GRJ; 2006 WL 2599130 at * 8 (M.D. Fla. May 15, 2006). The fact that Walsh was able to travel to Florida to assist with training and correct the alleged software defects also demonstrates that access to Florida is not overly burdensome. See Posner, 178 F.3d at 1221. Second, because Exceptional is a Florida resident, and the harm to Exceptional occurred in Florida, the State has a relatively strong interest in providing redress to its citizens. Third, Exceptional has "a great interest in the convenience of litigation in [its] home state." Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 259 (11th Cir. 1996). Fourth, consideration of the efficient use of resources points in no particular direction here because key witnesses and evidence exist equally in Florida and Maryland. Finally, there is no evidence that exercising jurisdiction over ProtoMed would thwart any interest of the states in furthering shared policies. Accordingly, because all factors are either neutral or weigh in favor of jurisdiction, the exercise of personal jurisdiction over ProtoMed is consistent with the Fourteenth Amendment.

ProtoMed's motion to dismiss for lack of personal jurisdiction shall be DENIED.

II.    Motion to Dismiss for Improper Venue and Motion to Transfer Venue

ProtoMed next argues that this case should be dismissed for improper venue pursuant to Fed. R. Civ. P. 12(b)(3), based on the mandatory forum selection clause in the EULA, which requires that all litigation concerning the ProtoMed Software be brought in Baltimore City, Maryland.

The Parties do not appear to dispute that Exceptional's claims would be encompassed by the forum selection clause, or that the clause is mandatory.[9]  There is also no dispute over the validity of clickwrap agreements such as the EULA.  Instead, the disagreement is whether or not the Parties ever mutually entered into the EULA such that its terms would be binding on Exceptional.

Exceptional argues, with affidavit testimony in support, that it cannot be bound by the EULA and, in particular, the forum selection clause, because: (1) it was not aware of the EULA until after it purchased the software from Fox; (2) Exceptional expressly rejected and refused to sign a copy of the EULA when it did become aware of it; (3) it never accepted any version of the EULA; (4) no one at Exceptional ever saw the software version of the clickwrap agreement, because it was installed remotely by ProtoMed; and (5) no one ever authorized ProtoMed to accept the clickwrap agreement on Exceptional's behalf.  On the other hand, ProtoMed argues that:  (1) it was authorized to accept the terms of the EULA

---

[9]See Global Satellite Communication Co. v. Starmill U.K. Limited, 378 F.3d 1269, 1272 (11th Cir. 2004) (mandatory forum selection clauses must be clear, unequivocal, and contain language of exclusivity).

on behalf of Exceptional when it installed the software as Exceptional's agent; and (2) Exceptional ratified the EULA through its continued use of the software, even after receiving two updated version of the EULA with the same forum selection clause.

The evidence currently before the Court on these issues is both conflicting and inadequate to resolve the pending venue motion, and an evidentiary hearing may be required in order to make the findings of fact necessary to rule on ProtoMed's motion. See Bryant v. Rich, 530 F. 3d 1368 (11th Cir. 2008); Lobo v. Celebrity Cruises, Inc., 426 F. Supp. 2d 1296 (S.D. Fla. 2006). ProtoMed's motion to dismiss for improper venue, and motion to transfer venue will therefore be referred to the United States Magistrate Judge for further proceedings.

## Conclusion

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)    The portion of Defendant ProtoMed Medical Management Corporation's Motion to Dismiss (Doc. 7) which seeks dismissal based on a lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) is DENIED;

(2)    The portion of Defendant ProtoMed Medical Management Corporation's Motion to Dismiss (Doc. 7) which seeks dismissal for improper venue pursuant to Fed. R. Civ. P. 12(b)(3), and the Defendant's motion to transfer venue pursuant to 28 U.S.C. § 1404(a) are REFERRED to the United States Magistrate Judge to conduct all proceedings he deems necessary and appropriate for preparing a report and recommendation.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 14th day of May, 2009.

_____
UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Hon. Gary R. Jones